IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ERIC HOLTON,

                        Plaintiff,                              OPINION and ORDER

    v.

                                                              11-cv-246-slc

GARY H. HAMBLIN, DAVID BURNETT
and PAUL SUMNICHT,

                        Defendants.

---

This is a proposed civil action for monetary relief brought under 42 U.S.C. § 1983. All parties have consented to the magistrate judge's jurisdiction over this case. Plaintiff Eric Holton, a prisoner at the Waupun Correctional Institution, alleges that defendant Paul Sumnicht[1] failed to adequately treat medical symptoms stemming from shotgun pellets lodged in his body and his compromised immune system. Currently before the court are Holton's motions for preliminary injunctive relief, to amend his complaint, for assistance in recruiting counsel and to compel discovery. For reasons stated below, I will deny each motion.

At the outset, I note that Holton has not complied with this court's procedures for briefing motions for preliminary injunctive relief. *See* Pretrial Conference Order, Dkt. 42. He does not cite to admissible evidence with regard to most of his proposed findings; even though he speaks at length about his personal experiences with symptoms and treatment, he does not include an affidavit—sworn under penalty of perjury—recounting his experiences. In any case, for the most part, Holton's proposed findings consist of him stating what he thinks defendant Sumnicht *should* be doing rather than recounting his own treatment history. Therefore, the undisputed facts detailed below consist almost entirely from Dr. Sumnicht's submissions.

---

[1] Defendants Gary Hamblin and David Burnett remain in the case only to ensure that defendants with the power to enforce an injunction are named in the caption.

FACTS

Plaintiff Eric Holton is a prisoner in the custody of the Wisconsin Department of Corrections. He was transferred to the Waupun Correction Institution on May 5, 2010. Defendant Paul Sumnicht was employed as a physician at the Waupun Correction Institution (WCI) from March 4, 2007 until October 5, 2012.

At some point in the past, while in custody in another state, Holton was shot by a shotgun; he still has buckshot pellets beneath his skin. Holton believes that he has developed an allergy to the metallic pellets still in his body, which has caused swollen lymph nodes in the neck, recurring hives in his chest area, frequent severe sinus headaches and congestion.

On June 14, 2010, Dr. Sumnicht consulted with Holton, who complained of allergy symptoms, night sweats, difficulties breathing, severe headaches, chest pains, stomach pains, back pains and fever. Dr. Sumnicht noted the following: "heart regular, lungs clear and possible Mycobacterium Avium-Intracellulare Complex (MAC)."

MAC is generally present in the environment, and it is harmless to most people. However, for some people MAC is a potentially serious disease that causes pneumonia-like symptoms, including coughing and coughing up blood, fever, fast heart rate and trouble breathing. MAC may cause these symptoms in some people who have a significantly compromised immune system. A common treatment for MAC symptoms is to administer multiple antibiotics for about five months. If a patient is not exhibiting the symptoms of MAC, then the mere presence of MAC in the patient does not require treatment.

Dr. Sumnicht found that Holton did not exhibit the symptoms of MAC: Holton's heart rate was regular, his lungs were clear, and he was not coughing, let alone coughing up blood. The

absence of these symptoms indicated that there was no need to treat Holton for MAC. Dr. Sumnicht found that Holton did have a congested, bloody nose and watery eyes, all symptoms of rhinitis, which is irritation and inflammation of the mucous membrane inside the nose. Dr. Sumnicht also based his diagnosis on the appearance of Holton's nose as pink and "boggy."

On December 6, 2010, Dr. Sumnicht saw Holton for follow-up. At this appointment, Holton discussed concerns about buckshot in his body and told Dr. Sumnicht that in 1990 he had been wounded by a blast from a 12-gauge shotgun. Holton asked to have the remaining imbedded shotgun pellets removed from his body because he believed that the pellets were causing night sweats, persistent coughing and chest pain. Holton also asked to be seen by an outside specialist to opine on the cause of Holton's symptoms. Dr. Sumnicht responded that the buckshot was not causing Holton's symptoms because the subcutaneous fat and scar tissue in which the buckshot is imbedded would not trigger allergic responses: unlike surface skin, fat and scar tissue under the skin are not routinely exposed to the histamines that cause allergic reactions. Subcutaneous shotgun pellets do not cause MAC. To alleviate Holton's rhinitis, Dr. Sumnicht prescribed SinuCleanse, a nasal wash that reduces sinus symptoms.

On January 21, 2011, Dr. Sumnicht saw Holton to address his complaints of chest and back pain. Holton discussed sinus headaches and wanting to get to the bottom of his problems. Holton continued to contend that his chest pain resulted from his buckshot wound. Dr. Sumnicht's examination showed a regular heart and clear lungs. Dr. Sumnicht diagnosed sinus congestion and, by consulting an August 20, 2009 low back x-ray, determined that Holton had arthritis, which was a likely source of his pain.

On February 22, 2011, Holton presented with complaints of back pain, nasal congestion, sinus headache, night sweats, and pain in his left upper chest wall where buckshot was embedded. Examination showed that Holton's lungs were clear. Dr. Sumnicht prescribed Tegretol to treat Holton's chest pain. Tegretol is an anticonvulsant medication that calms nerves and alleviates pain. Dr. Sumnicht also prescribed Tylenol to ease Holton's pain. Dr. Sumnicht prescribed heartburn medication to treat heartburn symptoms that may have been the source of Holton's chest pain. Based on Holton's constellation of symptoms, Dr. Sumnicht concluded that these pain-reducing measures were the most appropriate treatment.

On February 23, 2011, Holton underwent a radioallergosorbent test (RAST), which measures a person's immune system response to allergens by measuring the amount of allergy-causing antibodies in the bloodstream, known as immunoglobulin E antibodies. Holton's RAST level was 7.3 IU/mL, a relatively low level indicating that there was not a significant allergy concern that would warrant further testing.

On September 26, 2011, Dr. Sumnicht met with Holton for follow up. Dr. Sumnicht reviewed a Quantiferon Gold test Holton underwent in 2007. That test was negative for Mycobacterium Tuberculosis (TB). TB and MAC both produce Quantiferon Gold, an anti-infection protein. The Quantiferon Gold test, however, stays positive even after a patient has been treated for TB. In contrast, the test does not stay positive in cases of MAC. Holton's Quantiferon Gold test was negative, meaning that he did not have TB. Dr. Sumnicht also reviewed the result of an acid fast bacilli smear that Holton underwent on July 29, 2005. That test identified Holton as having MAC based on a sample of his sputum. It was Dr. Sumnicht's

4

medical opinion that Holton's MAC was currently controlled by the antibodies produced by Holton's immune system, based on the fact that Holton did not display the symptoms of MAC.

On November 10, 2011, Holton underwent a series of blood tests. Holton's tests were normal, except that his angiotensin-converting enzyme (ACE) was high. On December 2, 2011, Dr. Sumnicht saw Holton for follow-up regarding his elevated ACE. Dr. Sumnicht's findings were: heart regular, lungs clear, back pain not limiting function and no other abnormal findings. Holton's elevated ACE level was indicative of sarcoidosis, a chronic lung disease. The cause of sarcoidosis is unknown, although Dr. Sumnicht's opinion is that neither MAC nor the shotgun pellets caused Holton's sarcoidosis. Sarcoidosis inflammation can result in enlarged lymph nodes. Holton's sarcoidosis cannot be cured, but its symptoms can be treated and controlled during flare-ups.

Also on December 2, 2011, Dr. Sumnicht consulted a January 14, 2010, x-ray with frontal and lateral views. The x-ray showed no evidence of lung disease. Multiple tiny metallic densities were noted in the soft tissues of the left chest and left neck. Dr. Sumnicht prescribed Qvar, an inhaled steroid, at 80 mcg. per puff once a day to treat Holton's sarcoidosis. Holton's ACE levels were two times normal at their worst, but came down with Holton's use of Qvar.

On December 30, 2011, Dr. Sumnicht met with Holton for follow-up to his elevated ACE and chest pain. Dr. Sumnicht noted heart regular and lungs clear. A possible symptom of sarcoidosis is chest pain, as it can cause lung discomfort. Also on December 30, 2011, Holton requested a pulmonary consult. Dr. Sumnicht did not request a consult at that time for Holton because his sarcoidosis symptoms were not severe enough to warrant a consult. (Relevant to this determination, Holton's lungs were clear with no evidence of breathing problems.)

On February 6, 2012, Holton had a spirometry test, which is a computerized air flow breathing test for asthma, emphysema, and air flow. Holton's spirometry test was normal, indicating that his sarcoidosis was under control.

On February 13, 2012, Dr. Sumnicht saw Holton for follow-up. Dr. Sumnicht noted: blood pressure elevated, heart regular, lungs clear, back pain, no cough and palpable lymph nodes. On June 5, 2012, as an additional avenue for evaluating the sarcoidosis and based on the fact that Holton had shown two elevated ACE levels, Dr. Sumnicht requested approval for a spiral computed tomography (CT) of Holton's chest to evaluate his enlarged lymph nodes. Dr. Sumnicht noted that Holton had a cough and chest pain; he requested a pulmonary consult after the CT.

Wisconsin Department of Corrections policy governing how practitioners obtain approval to refer inmates offsite for non-emergency care requires a physician to submit the request to the Bureau of Health Services (BHS). Upon receiving Dr. Sumnicht's request for a CT and pulmonary consult, BHS changed it to a surgical consult for a possible biopsy of Holton's lymph nodes. In Dr. Sumnicht's opinion, BHS correctly determined that a consult with a surgeon for a possible biopsy was a better approach because it allowed direct examination of Holton's lymph nodes, which was Holton's main symptom of concern at this point.

On June 14, 2012, Dr. Sumnicht referred Holton to an outside physician, Dr. Robert Mikkelsen, a general surgeon at the Fond du Lac Regional Clinic, for a consultation for a possible biopsy of Holton's supraclavicular lymph nodes. On July 6, 2012, Holton met with Dr. Robert Mikkelsen. Upon examination of Holton, Dr. Mikkelsen advised that the supraclavicular nodules

were not suspicious for malignancy and that the risk of removing them for a biopsy far outweighed any potential benefit that could be obtained by removing them.

On August 8, 2012, Holton underwent a blood test to measure his ACE. The result showed a normal ACE level, which indicated that the inhaled steroid treatment was effectively treating Holton's the sarcoidosis. On August 17, 2012, Dr. Sumnicht examined Holton and noted no enlarged lymph nodes, ACE level was normal, lungs clear, and heart regular. On August 27, 2012, Holton underwent a chest x-ray that revealed Holton's lungs were clear.

On October 1, 2012, Dr. Sumnicht saw Holton for a follow-up regarding chest pain, which was not cardiac in nature. Dr. Sumnicht also observed that Holton's left pectoral muscle was sore, which indicated that the pain was localized to that area. Dr. Sumnicht observed that Holton had stopped his heartburn medication, which meant that heartburn was a possible source of the pain. Dr. Sumnicht gave Holton heartburn medication for treatment. It is Dr. Sumnicht's opinion based on Holton's test results and exams that Holton's conditions were stabilized by October 2012. Dr. Sumnicht relied on the improved lymph nodes, normal breath tests, the normal ACE levels and the x-ray showing clear lungs.

Since Dr. Sumnicht left WCI, Holton's only subsequent medical record shows a complaint from Holton about a growth in his left armpit, which was evaluated by nursing staff on October 18, 2012. The nurse report indicates that Holton is being referred to a provider for "possible removal."

There is no evidence in the medical record that Holton had symptomatic night sweats. Night sweats that might be associated with a serious disease would result in a significant soaking of Holton's clothes and also would result in weight loss. Dr. Sumnicht did not see evidence of

7

night sweats on Holton. For example, he did not observe his clothes to be soaked through, nor did Dr. Sumnicht observe bodily odors that would accompany night sweats. At most, Dr. Sumnicht observed that Holton had a moist collar on occasion, consistent with normal sweating. In addition, Dr. Sumnicht did not see evidence of Holton losing weight. In fact, Holton gained weight during the period in which Dr. Sumnicht treated him: on October 10, 2010, Holton weighed 193 pounds; on May 30, 2012, he weighed 209 pounds. On November 10, 11 and 12, 2011, nursing staff attempted on several occasions to verify if Holton was having night sweats, but each time they checked on Holton, he was not suffering from them.

OPINION

## I. Preliminary Injunction Motion

The standard applied to determine whether a plaintiff is entitled to preliminary injunctive relief is well established:

> A district court must consider four factors in deciding whether a preliminary injunction should be granted: 1) whether the plaintiff has a reasonable likelihood of success on the merits; 2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; 3) whether the threatened injury to the plaintiff outweighs the threatened harm an injunction may inflict on defendant; and 4) whether the granting of a preliminary injunction disserve the public interest.

*Pelfresne v. Village of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989). At the threshold, Holton must show some likelihood of success on the merits and that irreparable harm will result if the requested relief if denied. If Holton makes both showings, the court then moves on to balance the relative harms and public interest, considering all four factors under a "sliding scale"

approach. *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir. 1997). Thus, to obtain a preliminary injunction, a movant must first prove that his claim has "at least some merit." *Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 618 (7th Cir. 2007)(citing *Cavel International, Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007)). Holton's failure to provide admissible evidence to support his proposed findings of fact, coupled with Dr. Sumnicht's submission of his detailed history of treating Holton, dooms both of his claims.

A prison official may violate a prisoner's right to adequate medical care under the Eighth Amendment if the official is "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). The condition does not have to be life threatening. *Id.* A medical need may be serious if it "significantly affects an individual's daily activities," *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998), if it causes significant pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825 (1994). "Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the risk by failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

To prevail on a claim for negligence or medical malpractice in Wisconsin, Holton must prove that Dr. Sumnicht breached his duty of care to him and that he suffered injury as a result. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

Holton's motion for preliminary injunctive relief must be denied because he fails to show he has a reasonable likelihood of success on the merits of either of his claims. Holton's medical records show that Dr. Sumnicht does not consider Holton to be suffering from MAC or from allergies resulting from the embedded shotgun pellets. Instead, Dr. Sumnicht has diagnosed Holton as suffering from sarcoidosis and has provided treatment that appears to have worked. Dr. Sumnicht has also has ordered various other tests for Holton, including an outside referral for lymph node biopsy.

There is no countervailing evidence in the record. When a party argues that his medical providers' treatment decisions have been made with deliberate indifference, he must show that the decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision[s] on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996); *Snipes v. De Tella*, 95 F.3d 586, 590-91 (7th Cir.1996) (plaintiff must show that treatment decision was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition"). Holton has not submitted expert testimony addressing these standards; even if he had, even a difference of opinion as to how Dr. Sumnicht should have treated Holton would not support a finding of deliberate indifference. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). For the most part, Holton simply makes conclusory statements about being denied treatment even though the medical record shows that he has received treatment. Holton is not qualified to make his own diagnosis regarding his symptoms or to offer an opinion about how Dr. Sumnicht should have treated them.

At this point, the medical records showing when, how and why Dr. Sumnicht examined and treated Holton are enough to defeat Holton's motion for preliminary injunctive relief. Moving forward, at the summary judgment phase (which currently is being briefed), Holton will have to present admissible evidence detailing how he believes Dr. Sumnicht's treatment is inadequate, along with testimony from medical professionals if he wants to argue that Dr. Sumnicht has misdiagnosed him.

## II. Motion to Amend Complaint

Holton has filed a motion "to amend the pleadings to conform to the evidence regarding David Burnett's personal involvement" as the "medical director." Holton states that he wants to bring claims against Burnett based on his proposed findings of fact discussed above. However, Holton does not mention Burnett by name in those proposed findings, so it is difficult to understand the basis for any claims against Burnett. In any case, the court would not allow Holton to amend his complaint in such a way even if his allegations against Burnett were clear, so the motion will be denied for the time being. In order to properly amend his complaint, Holton will have to either file an entirely new version of his complaint, or at the very least, provide a discrete supplement to his current operative complaint (dkt. 17) that contains specific allegations against Burnett.

Holton also asks for a copy of his operative complaint, which the court will send him. As instructed earlier in this case, he should keep copies of all of his filings.

### III. Motion for Assistance in Recruiting Counsel

Holton has renewed his previous motion for the court's assistance in recruiting counsel to assist him. I will deny his motion because I am still not convinced that the legal and factual difficulty of the case exceeds Holton's ability to prosecute it. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007). However, the denial of his motion is without prejudice, so Holton may renew the motion should the case progress past the summary judgment stage.

### IV. Motion to Compel

Finally, Holton has filed a motion to compel Dr. Sumnicht to provide him with copies of all DOC medical policies and procedures, as well as his medical records. Dr. Sumnicht has responded, stating that Holton already has access to his medical records and has been given instructions to contact Linda Alsum-O'Donovan, program support supervisor at his institution, regarding viewing the medical policies. Because Dr. Sumnicht has made these documents available to Holton, I will deny the motion to compel.

ORDER

It is ORDERED that:

(1) Plaintiff Eric Holton's motion for preliminary injunctive relief, dkt. 17, is DENIED.

(2) Plaintiff's motion to amend his complaint, dkt. 37, is DENIED without prejudice.

(3) Plaintiff's renewed motion for assistance in recruiting counsel, dkt. 45, is DENIED without prejudice.

(4) Plaintiff's motion to compel discovery, dkt. 48, is DENIED.

Entered this 2nd day of August, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge