IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ERIC HOLTON,

                              Plaintiff,                           OPINION and ORDER

        v.                                                        11-cv-246-slc

GARY H. HAMBLIN, DAVID BURNETT
and PAUL SUMNICHT,

                              Defendants.

        Plaintiff Eric Holton, a prisoner at the Waupun Correctional Institution, alleges that

defendant Paul Sumnicht[1] violated the Eighth Amendment and state medical negligence law by

failing to treat medical symptoms stemming from shotgun pellets lodged in his body and his

compromised immune system.  The following motions are before the court:  (1) defendants'

motion for summary judgment, dkt. 54; (2) Holton's renewed motion for assistance in recruiting

counsel and motion for reconsideration of the court's August 2, 2013 order, dkt. 73; and (3)

Holton's motion for the extension of a legal loan, dkt. 81.

        I conclude that, based on the evidence actually presented to this court, a genuine dispute

exists as to whether Dr. Sumnicht failed to adequately address Holton's complaints of pain

during three discrete time periods: between June and December of 2010; between March 23 and

September 26, 2011; and after February 13, 2012.  Accordingly, I am denying defendants'

motion for summary judgment on Holton's federal and state claims related to his complaints of

pain at these times.

        I am granting summary judgment to the defendants in all other respects.  The evidence

does not support a finding that Dr. Sumnicht acted with deliberate indifference to Holton's

---

[1]  Defendants  Gary Hamblin and David Burnett remain in the case for the sole purpose of
including defendants who have the power to enforce an injunction if the court were to grant one.

other medical needs, and Holton does not have medical expert testimony to establish the standard of care for those conditions as required under state law.

I am denying Holton's motion for reconsideration.  Holton has failed to present any newly discovered evidence or to point to any manifest error that the court committed.  Holton also has failed to present any new factual or legal arguments that persuade me that he is entitled to appointment of counsel.

Finally, I conclude that it is unnecessary to grant Holton's request for an extension of a legal loan to copy (and presumably file) a motion for leave to amend his complaint because adding new allegations against another defendant at this point would unduly delay the progress of this case and would be unduly prejudicial to defendants.

As a preliminary matter, the court must address a few issues with Holton's responses to defendants' proposed findings of fact and his own proposed factual findings.  Holton has submitted an affidavit in which he describes various medical conditions and treatment dating back to the 1990s, Holton attempts to self-diagnose the cause of his symptoms and Holton states his own opinion about what treatment is appropriate for his various conditions.  *See, e.g.,* dkt. 72 at ¶¶ 74-76.  Although Holton may describe his symptoms and the medical treatment that he has received, he is not qualified to diagnose his symptoms, provide general medical information on conditions for which he has received a diagnosis or comment on whether a particular treatment is proper.  Further, because this lawsuit relates to treatment that Dr. Sumnicht provided between June 2010 and October 2012, actions of other individuals before or after this time period are largely irrelevant.  Therefore, I have accepted Holton's averments only to the extent that: (1) these averments relate to matters of which he has personal

2

knowledge; (2) these averments relate to the actions or knowledge of the defendants in this case; and (3) do not constitute inadmissible hearsay.

Against this backdrop, for the purpose of deciding the motion for summary judgment, I find from the parties' submissions that the facts set out below are material and undisputed:

## FACTS

### I. The Parties

Plaintiff Eric Holton is a prisoner in the custody of the Wisconsin Department of Corrections (DOC).  He was transferred to the Waupun Correction Institution (WCI) on May 5, 2010.

Defendant Paul Sumnicht was employed as a physician at WCI from March 4, 2007 until October 5, 2012.  Defendant Gary Hamblin is the secretary of the DOC.  Defendant David Burnett has been employed by the DOC as medical director of the Bureau of Health Services (BHS) since October 2001.

### II. Holton's Medical Treatment

In the past, when Holton was incarcerated at another institution, staff shot him with a shotgun.  Some buckshot from that wound remains lodged beneath his skin.  Holton is convinced that he has developed an allergy to this ensconced metal shot, which has caused him swollen lymph nodes in his neck, chest pain, recurring hives in his chest area, frequent severe sinus headaches and congestion.

At WCI, on May 15, 2010, Holton submitted a health service request (HSR), requesting a single cell because his cough kept his cellmate up at night and requesting extra t-shirts because he had night sweats.  In the HSR, Holton also informed the health services unit (HSU) of his medical history, including the alleged immune system problems caused by the pellets, allergies, prior treatment for tuberculosis (TB), a previous diagnoses of Mycobacterium Avium-Intracellulare Complex (MAC) and degenerative disc disease.

On June 2, 2010, Holton submitted another HSR, this time complaining of congestion and severe headaches.  A nurse saw Holton on June 8, 2010, scheduled a follow-up appointment with Dr. Sumnicht and gave him Sudogest, vitamins and Tylenol.

On June 14, 2010, Dr. Sumnicht consulted with Holton, who complained of allergy symptoms, night sweats, difficulties breathing, severe headaches, chest pains, stomach pains, back pains and fever.  Sumnicht noted the following:  "heart regular, lungs clear and possible [MAC]."

MAC is generally present in the environment, and it is harmless to most people. However, for some people MAC is a potentially serious disease that causes pneumonia-like symptoms, including coughing, coughing up blood, fever, fast heart rate and trouble breathing. MAC may cause these symptoms in some people who have a significantly compromised immune system.  A common treatment for MAC symptoms is to administer multiple antibiotics for about five months.  If a patient is not exhibiting the symptoms of MAC, then the mere presence of MAC in the patient's body does not require treatment.

Dr. Sumnicht found that Holton did not exhibit the symptoms of MAC:  Holton's heart rate was regular, his lungs were clear and he was not coughing, let alone coughing up blood.  The

4

absence of these symptoms indicated that there was no need to treat Holton for MAC.  Dr.
Sumnicht found that Holton did have a congested, bloody nose and watery eyes, all symptoms
of rhinitis, which is irritation and inflammation of the mucous membrane inside the nose.
Sumnicht also based his diagnosis on the appearance of Holton's nose as pink and "boggy."
Sumnicht believed that mold and pollen caused Holton's rhinitis.

Although Sumnicht did not examine Holton again until November 2010, Holton sought
the following care from other HSU staff:

- July 6, 2010:  Saw a nurse for fevers and chills, which he was having once or twice a month.  After that visit, Sumnicht ordered a series of tests and educated Holton on MAC and TB.

- September 22, 2010:  Visit with nurse.[2]

- October 15, 2010:  Submitted HSR asking for TB test because he had chest pain, night sweats, fever and an ongoing cough that produced thick mucus.  Saw nurse on October 19 for these symptoms.

- October 22, 2010:  Saw nurse for stomach pain.

- October 25, 2010:  Saw nurse for night sweats and she wrote instruction to send copy of special needs form concerning extra t-shirts to segregation.

- November 2, 2010:  Saw nurse for chest pain, lower back pain and rashes.

- November 3, 2010:  Submitted HSR about chest pain, night sweats and coughing.

- November 15, 2010:  Submitted HSR about abdomen pain and constipation.

- November 17, 2010:  Saw nurse who diagnosed potential reflux and scheduled appointment with doctor.

---

[2] Holton also avers that the nurse told him he never had TB and instead had MAC and needed extra t-shirts for his night sweats.  Holton's averments, offered for the truth of what the nurse told him, is inadmissible hearsay, and the medical records he cites do not mention any of these things.

On November 19, 2010, Dr. Sumnicht saw Holton for his stomach pain and constipation.  He diagnosed reflux and prescribed several medications.  Dr. Sumnicht did not address Holton's chest pain, coughing or night sweats.   At a follow-up appointment with Dr. Sumnicht on December 6, 2010, Holton discussed his concerns about the buckshot in his body and told Dr. Sumnicht that in 1990 he had been wounded by a blast from a 12-gauge shotgun.  At that visit and in subsequent HSRs, Holton asked to have the remaining imbedded shotgun pellets removed from his body because he believed that the pellets were causing night sweats, persistent coughing and chest pain.  Holton also asked to be seen by an outside specialist for an opinion on the cause of his symptoms.  According to Dr. Sumnicht, the buckshot was not causing Holton's symptoms because the subcutaneous fat and scar tissue in which the buckshot is imbedded would not trigger allergic responses:  unlike surface skin, fat and scar tissue under the skin are not routinely exposed to the histamines that cause allergic reactions.[3]  Subcutaneous shotgun pellets also do not cause MAC.

On December 28, 2010, Holton submitted an HSR complaining of chest pain from the pellets, severe back pain and sinus headaches.  Two days later, a nurse prescribed Tylenol.  Dr. Sumnicht saw Holton on January 21, 2011 to address these complaints.  Holton discussed sinus headaches and wanting to get to the bottom of his problems.  He continued to contend that his chest pain resulted from his buckshot wound and requested consultation with a specialist, which Dr. Sumnicht denied.  Dr. Sumnicht's examination of Holton showed a regular heart and clear lungs.  Dr. Sumnicht diagnosed sinus congestion.  By consulting an August 20, 2009 low back

---

[3] The parties dispute whether Sumnicht told Holton that only a specialist could confirm whether the pellets in his body were causing an allergic reaction.

6

x-ray, Dr. Sumnicht determined that Holton had arthritis, which was a likely source of his pain. Dr. Sumnicht prescribed Tylenol for Holton's pain.

On February 22, 2011, Holton presented with complaints of back pain, nasal congestion, sinus headache, night sweats and pain in his left upper chest wall where the buckshot was embedded.[4]  An examination showed that Holton's lungs were clear.  Dr. Sumnicht prescribed Tegretol and Tylenol to treat Holton's chest pain.  Tegretol is an anticonvulsant medication that calms nerves and can alleviate neuropathic pain.  Dr. Sumnicht also prescribed heartburn medication to treat heartburn symptoms that also might have caused Holton's chest pain.  Based on Holton's constellation of symptoms, Dr. Sumnicht concluded that these pain-reducing measures were the most appropriate treatment.

On February 23, 2011, Holton underwent a radioallergosorbent test (RAST), which measures a person's immune system response to allergens by measuring the amount of allergy-causing antibodies in the bloodstream, known as immunoglobulin E antibodies.  Holton's RAST level was 7.3 IU/ml.  According to Dr. Sumnicht, this is a relatively low level indicating that there was not a significant allergy concern that would warrant further testing.[5]

Holton avers that over the next six months, he repeatedly complained that the Tegretol was ineffective until Dr. Sumnicht finally discontinued it.

---

[4] Holton describes his lymph nodes as swollen and his sinus headaches as severe.

[5] Holton avers that he was not informed of this test result until the defendants produced it during the course of this lawsuit.

Holton's interaction with the HSU continued as follows:

- March 23, 2011:  Submitted HSR complaining that Tegretol and Tylenol did not help chest pain, back pain or sinus headaches and asked to see a specialist.

- April 14, 2011:  Complained about back and chest pain to a nurse who told him to continue the medication that Dr. Sumnicht prescribed.

- August 10, 2011:  Submitted HSR complaining about severe headaches, chest pain and back pain and informed staff that Tylenol did not help.

- August 12, 2011:  Saw nurse and informed her that Tegretol and Tylenol were not working.

- August 12, 2011:  Wrote HSU manager that he had not yet seen doctor about complaints that medications not helping his pain.

- August 30, 2011:  Saw nurse about back pain and having problems moving.

- September 26, 2011: Dr. Sumnicht examined Holton, discontinued the Tegretol and  prescribed Gabapentin, another neuropathic pain reliever. (According to Holton, Dr. Sumnicht also conducted a skin allergy test related to the RAST test and diagnosed "dermatographism," which meant that Holton got hives when pressure was applied to his skin.[6])

During the September 26, 2011 visit, Dr. Sumnicht also reviewed Holton's 2007 test for

Quantiferon Gold, which is an anti-infection protein.  Both TB and MAC produce Quantiferon

Gold, but the test stays positive even after a patient has been treated for TB.  In contrast, the

test does not stay positive in cases of MAC.  Holton's Quantiferon Gold test was negative,

meaning that he did not have TB.  Dr. Sumnicht also reviewed the result of an acid fast bacilli

---

[6] Defendants generally assert that Holton does not cite admissible evidence in support of this proposed finding of fact, and that he is asserting a medical conclusion and citing to medical records that do not support the medical conclusion he asserts.  However, Holton has stated this fact in his affidavit and he can speak to the fact that a test occurred and that Dr. Sumnicht told him that he had such a condition.

smear that Holton underwent on July 29, 2005. That test identified Holton as having MAC based on a sample of his sputum. It was Dr. Sumnicht's medical opinion that Holton's MAC was being adequately controlled by the antibodies produced by Holton's immune system, based on the fact that Holton did not display the symptoms of MAC.

On November 3, 2011, Dr. Sumnicht saw Holton for chest and back pain and increased his dose of Gabapentin. On November 10, 2011, Holton underwent a series of blood tests The tests were normal, except for an elevated angiotensin-converting enzyme (ACE).

On December 2, 2011, Dr. Sumnicht saw Holton for follow-up and found: heart regular, lungs clear, back pain not limiting function and no other abnormal findings. Holton complained that the Gabapentin was not working for his pain; Dr. Sumnicht prescribed Meloxicam (an NSAID sometimes used to treat neuropathic pain) and Pantoprazole for heartburn.

Holton's elevated ACE level was indicative of sarcoidosis, a chronic lung disease. The cause of sarcoidosis is unknown, although Dr. Sumnicht's opinion is that neither Holton's MAC nor his imbedded shotgun pellets caused Holton's sarcoidosis. Sarcoidosis inflammation can result in enlarged lymph nodes. Holton's sarcoidosis cannot be cured, but its symptoms can be treated and controlled during flare-ups.

During the December 2, 2011 visit, Dr. Sumnicht consulted a January 14, 2010 x-ray with frontal and lateral views. The x-ray showed no evidence of lung disease. Multiple tiny metallic densities were noted in the soft tissues of the left chest and left neck. Dr. Sumnicht prescribed Qvar, an inhaled steroid, at 80 mcg. per puff once a day to treat Holton's sarcoidosis. Holton's ACE levels were two times normal at their worst, but on December 14, 2011, Holton's

blood test revealed a lowered ACE level of 87 U/L.[7]  (The reference range for ACE is 12 to 68 U/L.)

On December 30, 2011, Dr. Sumnicht met with Holton for follow-up to his elevated ACE and chest pain and noted heart regular and lungs clear.  A possible symptom of sarcoidosis is chest pain, as it can cause lung discomfort.  Dr. Sumnicht believed that the inhaled steroid treatment was the appropriate means of treating pain caused by sarcoidosis.  Although Holton requested a pulmonary consult, Dr. Sumnicht denied this request because Holton's sarcoidosis symptoms were not severe enough to warrant one.  Relevant to this determination, Holton's lungs were clear with no evidence of breathing problems.  At this visit, Sumnicht discontinued the Gabapentin and prescribed Amitriptylene (an antidepressant also used to treat neuropathic pain).

Over the next month, Holton continued to complain of pain and other symptoms:

- January 11, 2012:  Submitted HSR complaining that his headaches and back and chest pain kept him up at night and that his medication was not working.

- January 17, 2012:  Submitted HSR complaining that he had not yet seen a doctor and that he had back and chest pain and headaches that lasted three days.

- February 6, 2012:  Underwent spirometry test, which is a computerized air flow breathing test for asthma, emphysema, and air flow.  The test was normal, indicating that sarcoidosis was under control.

---

[7] Defendants assert that although 87 U/L is still above normal, the lowered level shows that Holton had a positive reaction to the Qvar.  Holton disputes this because he avers that he did not use Qvar until December 26, 2011, when the officers gave it to him in segregation without any instructions on how to use it.

- February 8, 2012:  Submitted HSR complaining that Tylenol did not help his headaches.

- February 9, 2012:  Saw nurse who told him he had high blood pressure.

- February 13, 2012: Follow-up appointment with Dr. Sumnicht who noted blood pressure elevated, heart regular, lungs clear, back pain, no cough and palpable lymph nodes.  According to Holton, Dr. Sumnicht told him that there was nothing else that he could prescribe for Holton's pain and that any further complaints of pain would be "futile."

- March 2012:  Submitted two HSRs complaining of night sweats and skin rashes on his ankles, legs and elbows.  He also stated that he needed treatment for MAC.

- April 10 and May 25, 2012: Submitted HSRs asking to be treated for MAC.

- May 30, 2012:  Submitted HSR complaining of headaches and back pain, explaining that Tylenol and Amitriptylene were not working.  Seen by nurse on same day.

On June 5, 2012, as an additional avenue for evaluating the sarcoidosis and based on the fact that Holton had shown two elevated ACE levels, Dr. Sumnicht requested approval for a spiral computed tomography (CT) of Holton's chest to evaluate his enlarged lymph nodes.  Dr. Sumnicht noted that Holton had a cough and chest pain; he requested a pulmonary consult after the CT.

DOC policy governing how practitioners obtain approval to refer inmates offsite for non-emergency care requires a physician to submit the request to the Bureau of Health Services (BHS).  Upon receiving Dr. Sumnicht's request for a CT and pulmonary consult, BHS changed it to a surgical consult for a possible biopsy of Holton's lymph nodes.  In Dr. Sumnicht's opinion, BHS correctly determined that a consult with a surgeon for a possible biopsy was a better approach because this would allow a direct examination of Holton's lymph nodes, which

was Holton's main symptom of concern at this point.  In addition, Holton's breathing remained good, confirming that he did not need a pulmonary consult.

On June 14, 2012, Dr. Sumnicht referred Holton to an outside physician, Dr. Robert Mikkelsen, a general surgeon at the Fond du Lac Regional Clinic, for a consultation for a possible biopsy of Holton's supraclavicular lymph nodes.  On July 6, 2012, Holton met with Dr. Robert Mikkelsen.  Upon examination of Holton, Dr. Mikkelsen advised that the supraclavicular nodules were not suspicious for malignancy and that the risk of removing them for a biopsy far outweighed any potential benefit that could be obtained by removing them.  Holton's nodules are located close to large blood vessels that likely would be damaged if the nodules were removed.  Removal of the nodules also would have increased Holton's pain and scarring.

On August 8, 2012, Holton underwent a blood test to measure his ACE.  The result showed a normal ACE level of 56 U/L, which indicated that the inhaled steroid treatment was effectively treating Holton's sarcoidosis.  On August 17, 2012, Dr. Sumnicht examined Holton and noted no enlarged lymph nodes, normal ACE level, lungs clear and heart regular.  On August 27, 2012, Holton underwent a chest x-ray that revealed that his lungs were clear.

On October 1, 2012, Dr. Sumnicht observed that Holton had stopped his heartburn medication, which meant that heartburn now was a possible source of his current chest pain.  Dr. Sumnicht gave Holton heartburn medication for treatment.  Although Dr. Sumnicht stopped working at WCI on October 5, 2012, he saw Holton for a final examination on October 31.  Holton complained about breathing difficulties and coughing; Sumnicht diagnosed irritated

vocal cords and prescribed Benzonatate.[8]  It is Dr. Sumnicht's opinion based on Holton's test results and exams that Holton's conditions were stabilized by October 2012.  Dr. Sumnicht relied on the improved lymph nodes, normal breath tests, the normal ACE levels and the x-ray showing clear lungs.

### III.  Night Sweats

On several occasions between May 2010 and May 2012, Holton complained of night sweats as a symptom of an illness.  According to Dr. Sumnicht, night sweats that might be associated with a serious disease would result in a significant soaking of Holton's clothes and also would result in weight loss.[9]  Dr. Sumnicht did not see evidence of Holton losing weight.  In fact, Holton gained weight during the period in which Dr. Sumnicht treated him:  on October 10, 2010, Holton weighed 193 pounds; about 19 months later, on May 30, 2012, Holton was up to 209 pounds.

---

[8] Benzonatate is a cough suppressant that acts directly on the lungs and breathing passages.  *See* http://www.mayoclinic.com/health/drug-information/DR600233 (last visited December 2, 2013).

[9] The parties dispute whether Holton's clothing soaked through.  Dr. Sumnicht did not observe Holton's clothes to be soaked through, nor did he smell the bodily odors that would accompany night sweats.  At most, he observed that Holton had a moist collar on occasion, consistent with normal sweating.  In addition, on November 10, 11 and 12, 2011, nursing staff attempted on several occasions to verify if Holton was having night sweats, but each time they checked on Holton, he was not suffering from them.  Holton avers that his clothes soaked through during the middle of the night but when nurses came to verify this at 7:30 a.m. or 8:00 a.m., his shirt had dried.

OPINION

## I.  Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, he must come forward with enough evidence on each of the elements of his claim to show that a reasonable jury could find in his favor.  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

## II.  Eighth Amendment

To survive summary judgment, Holton must present evidence supporting the conclusion that he had an "objectively serious medical need" and that Sumnicht was aware of his serious medical need and was "deliberately indifferent" to it.  *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).  Defendants do not challenge

Holton's claim that his symptoms and medical conditions constitute serious medical needs, but they contend that Holton has not established that Dr. Sumnicht acted with deliberate indifference to those needs.

A plaintiff proves deliberate indifference by establishing that a prison official knows of a substantial risk of harm to an inmate and "either acts or fails to act in disregard of that risk." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citing *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)).  When the defendant is a medical professional who has provided some treatment to the plaintiff, the question is whether that treatment was constitutionally adequate. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).  To prove that it was *not*, a plaintiff must establish that the treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 751 (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

Proof of medical malpractice or negligence — even "gross negligence"— are not enough to meet the higher deliberate indifference standard.  *Farmer*, 511 U.S. at 836.  Likewise, mere disagreement with a doctor's medical judgment is not enough to prove deliberate indifference in violation of the Eighth Amendment.  *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010) (citing *Estelle*, 429 U.S. at 106 )(citation omitted)); *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).  A delay in treatment for a serious medical issue might rise to the level of deliberate indifference if this delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (citing *Estelle*, 429 U.S. at 104-05).

Holton contends that Dr. Sumnicht delayed or denied adequate testing and treatment for a variety of conditions and symptoms.[10]   Specifically, Holton claims that Dr. Sumnicht:

1.   Denied Holton adequate testing and treatment for chronic allergies resulting from the pellets in his chest, which Holton states led to MAC, degenerative disc disease and sarcoidosis.  Holton believes that he should have been referred to a specialist.  Holton also faults Dr. Sumnicht for not telling him the positive results of his February and September 2011 allergy tests.

2.   Failed to diagnose or treat adequately Holton's MAC, chronic obstructive pulmonary disease (COPD) and sarcoidosis.  Holton believes that Dr. Sumnicht should have referred him to a pulmonary specialist for the sarcoidosis.

3.   Did not refer Holton to a TB specialist despite his positive TB test in 1999, night sweats, coughing, chest pains, fever, stomach pain and skin rashes.

4.   Denied Holton adequate treatment for his headaches, back pain (including arthritis) and chest pain and refused to address his pain at all after February 13, 2012.

Although I will address Holton's claims separately, a general comment is in order: in ruling on Holton's motion for preliminary injunctive relief, I cautioned Holton that in order to survive a motion for summary judgment on most of his claims, he would have to present admissible evidence detailing how he believes that Dr. Sumnicht's treatment was inadequate and testimony from medical professionals challenging Dr. Sumnicht's diagnoses and treatment decisions.  Holton has not submitted expert testimony addressing these standards; even if he had, a difference of opinion as to how Dr. Sumnicht should have treated Holton would not

---

[10] Holton also alleges that after he complained about Dr. Sumnicht's inadequate treatment and refusal to send him to a specialist, Dr. Sumnicht retaliated against him by terminating his special needs request for extra t-shirts and not ordering a TB test.  I have not considered those allegations because they are not part of the claims on which Holton was allowed leave to proceed.

support a finding of deliberate indifference. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Holton has submitted his own affidavit setting forth *his* opinions on his medical conditions.  Holton, however, is not qualified to diagnose his symptoms or to offer an opinion about how Dr. Sumnicht should have treated him.  Also irrelevant and inadmissible are Holton's cites to general medical sources; those sources do not explain whether the particular tests and treatments given Holton were proper in light of his particular set of symptoms.  As a result, in all but one area, Holton has failed to raise a genuine question of fact whether Dr. Sumnicht acted with deliberate indifference to his various medical conditions.

The one exception is Dr. Sumnicht's alleged failure to address Holton's pain.  In contrast to Holton's other symptoms and conditions, Holton can describe his pain and report whether the medications he received relieved it.  As discussed further below, Holton has succeeded in raising an issue of fact as to whether Dr. Sumnicht acted with deliberate indifference to his continued pain during certain points in time.

### A.  Embedded Buckshot

Although Holton is convinced that he is allergic to the metal buckshot embedded in his chest and that he has developed several medical conditions as a result, the medical evidence shows otherwise.  According to Dr. Sumnicht, the buckshot was not causing Holton's symptoms because the subcutaneous fat and scar tissue in which the pellets are imbedded are not routinely exposed to the histamines that cause allergic reactions.  Further, allergy testing conducted on

February 23, 2011 showed a relatively low level of allergy-causing antibodies in Holton's bloodstream, indicating that further testing was unnecessary.

Holton faults Dr. Sumnicht for not telling him about the February 2011 test or a later positive allergy test.[11]   Even if this is true, however, the mere fact that Holton exhibited a positive allergic reaction does not establish that Holton was allergic to the pellets or that the pellets caused his other health problems.  It is Dr. Sumnicht's medical opinion that the pellets are not able to cause allergies or any of the other symptoms that Holton describes.  Without medical evidence to contradict that opinion, Holton cannot show that Dr. Sumnicht acted with deliberate indifference by not having the these pellets removed.

### B.  MAC

Dr. Sumnicht has stated his medical opinion that Holton did not require treatment between 2010 and 2012 because Holton was not displaying symptoms of the disease at the time. Holton's heart rate was regular, his lungs were clear and he was not coughing up blood.  In an attempt to dispute this opinion, Holton points to medical records dated between 1999 and 2007 as evidence that he suffered from MAC.  A 2005 test identified Holton as having MAC based on a sample of his sputum.  Although barely legible, medical treatment notes dated between 1999 and 2007 indicate that Holton had symptoms of MAC at some point prior to 2007.  Dkt.

---

[11]  Holton avers (and defendants have not disputed) that Dr. Sumnicht performed another type of allergy test on September 26, 2011 and diagnosed him with dermatographism (a condition in which pressure to the skin causes hives).

72, exh. 1 at 9.  Even so, these findings are irrelevant to this lawsuit because they do not show that Holton was experiencing symptoms when Dr. Sumnicht examined him three years later.

Holton also appears to believe that his alleged night sweats are a symptom of MAC and possibly other diseases.  Dr. Sumnicht has stated his uncontroverted opinion that night sweats associated with a serious disease would result in a significant soaking of clothing and weight loss.  Although the parties dispute whether Holton soaked through his clothing, it is undisputed that Holton was not losing weight.  More significantly, Holton has not presented any medical evidence that night sweats are a symptom of MAC or any other disease, or that they caused him any obvious, significant harm.  *See Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007) (citing *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) (serious medical need includes both diagnosed conditions requiring treatment and conditions "so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").  As a result, Holton has not shown that Dr. Sumnicht did not rely on medical judgment in failing to consider his night sweats as a symptom of a serious medical need.

### C.  Tuberculosis (TB)

Dr. Sumnicht did not consider Holton to be suffering from TB.  In response, Holton points out that he previously had tested positive for TB and was exhibiting a variety of symptoms, including night sweats, coughing, chest pains, fever, stomach pain and skin rashes.  Although there is some evidence in the record that Holton underwent a six-month course of treatment for TB in 1999, chest x-rays taken in January 1999 showed no evidence of acute or active TB disease.  *See* Holton's Medical records, dkt. 72, exh. 1 at 6.  Holton claims that a

second chest ray taken in February 1999 showed granular masses in his lungs, but the records he cites do not support this claim. *See* dkt. 71, PPFOF #10. In any event, Holton admits that a chest x-ray taken several years later in 2007 showed no evidence of TB. *See id.*, PPFOF #25. Further, there is no medical evidence in the record indicating that the conditions Holton describes are even symptoms of TB.

After reviewing Holton's medical file, Dr. Sumnicht explained to Holton during an office visit on September 26, 2011 that although both TB and MAC produce Quantiferon Gold, an anti-infection protein, the Quantiferon Gold test stays positive even after a patient has been treated for TB. In contrast, the test does not stay positive in cases of MAC. In 2007, Holton had a negative Quantiferon Gold test, meaning that he did not have TB. The upshot of all this is that there is no evidence that Dr. Sumnicht acted with deliberate indifference by not treating Holton for TB or sending him to a TB specialist.

### D. COPD and Sarcoidosis

It is unclear why Holton believes that he has COPD. There is no evidence that Holton had any lung disease other than sarcoidosis. Chest x-rays taken in January 2010 and August 2012 and Dr. Sumnicht's regular examinations showed that Holton's lungs were clear. Although Holton insists that Dr. Sumnicht should have provided better treatment and a referral to a specialist for his sarcoidosis, he presents no medical evidence to contradict Dr. Sumnicht's opinion that his symptoms were under control and effectively treated with the inhaled steroid.

Although Holton had an elevated ACE level in November 2011, a December 14, 2011 blood test showed improvement and the level returned to normal by August 2012. Holton

argues that the steroid could not have affected his sarcoidosis because he did not take it until the end of December 2011, after his ACE level had decreased on December 14, 2011. Whether the steroid had the desired effect at the time of the December 14 test is largely irrelevant. Dr. Sumnicht had reasonably responded to Holton's condition by prescribing the medication and later referring him for a lymph node biopsy.[12] Whatever the reason, it is undisputed that Holton got better, never experienced breathing problems and did not require further treatment.

### E. Pain Management

The remainder of Holton's complaints relate to his reports of untreated or insufficiently treated pain. Holton claims that Dr. Sumnicht ignored his complaints of chest pain in November 2010 and provided him with Tylenol and other medications that failed to relieve his headaches, chest pain and back pain (including degenerative disc disease and arthritis[13]).

Defendants, in seeking summary judgment on these claims, argue that the only medical opinion in this case is that Holton had been provided proper pain management for his symptoms, and that Holton was lobbying for *different* pain management treatment. In support, defendants cite a general statement from Dr. Sumnicht that "[t]o the extent that Holton has complained about pain, he was provided with pain medications, which is an appropriate medical response to his pain that is not cardiac in nature and that poses no other serious health risk."

---

[12] Sarcoidosis inflammation can result in enlarged lymph nodes.

[13] Holton generally alleges that Dr. Sumnicht failed to treat his arthritis adequately. On January 21, 2011, Dr. Sumnicht consulted a 2009 x-ray and determined that Holton had arthritis, which was likely causing him pain. Sumnicht prescribed Tylenol. Because neither Holton nor Dr. Sumnicht make any other references to arthritis, I am assuming that Holton is challenging Dr. Sumnicht's decision to prescribe him Tylenol as a pain medication.

Dkt. 57 at ¶ 8.  This is fine as far as it goes, but without additional detail, Dr. Sumnicht's statement, standing alone, does not sufficiently respond to or counter some of Holton's specific complaints of pain during three specific time periods:

**(1) June 14, 2010 to December 30, 2010.**

The evidence before this court shows that Holton first complained about chest pain to Dr. Sumnicht during a June 14, 2010 HSU visit and repeated his complaints of chest pain in HSRs submitted on October 15 and November 3, 2010.  Although Holton saw a nurse for these complaints on November 2, 2010, there is no indication in the record submitted to this court that anyone took any action in response.  Dr. Sumnicht did not discuss Holton's pain or otherwise address it when he examined Holton on November 19, 2010.  Holton then submitted another HSR on December 28, 2010, complaining of chest pain, back pain and headaches.  Two days later, on December 30, 2010, a nurse finally prescribed Tylenol for Holton, and Dr. Sumnicht renewed that prescription for Holton's arthritis pain on January 21, 2011.  Although defendants emphasize that Dr. Sumnicht had determined that MAC was not the cause of Holton's symptoms, they have not explained why nothing was done to address Holton's pain between June and December of 2010.  (If something else *was* done, defendants have not put it in the record).

**(2) March 23, 2011 to September 26, 2011.**

On February 22, 2011, Holton saw Dr. Sumnicht with continued complaints of chest and back pain and headaches.  During that visit, Dr. Sumnicht prescribed more Tylenol, Tegretol

and a heartburn medication to help with Holton's chest pain.  However, between March 23, 2011 and August 30, 2011, Holton regularly complained that he suffered from chest, back and headache pain and reported that his medications were not relieving this pain.  When Dr. Sumnicht finally saw Holton on September 26, 2011, he discontinued the Tegretol and prescribed Gabapentin, replacing one neuropathic pain reliever with another  Defendants fail to explain why Dr. Sumnicht–or any other qualified care provider–did not address Holton's complaints of unrelieved pain for six months.

### (3) After February 13, 2012

By November 2011, Holton again was complaining that he was in pain and that his pain medications were not working.  On November 3, 2011, Dr. Sumnicht responded by increasing Holton's dosage of Gabapentin; on December 2, 2011 Dr. Sumnicht prescribed Meloxicam and Pantoprazole.  At the end of December 2011, Dr. Sumnicht also prescribed a steroid inhaler and Amitriptylene in an effort to ease Holton's discomfort.

Quickly thereafter, in January and February 2012, Holton renewed his complaints of headaches, chest pain and back pain.  When Holton saw Dr. Sumnicht on February 13, 2012, Dr. Sumnicht apparently told him that there was nothing else he could prescribe and that any further complaints of pain would be "futile."  Defendants have not disputed this narrative, nor have they explained why Dr. Sumnicht failed to address in some fashion Holton's complaints that the medications prescribed at the end of 2011 were no longer working.  Although Dr. Sumnicht later performed other tests and referred Holton for a lymph node biopsy in 2012,

there is no further discussion of measures taken to address Holton's reports of pain, even though he continued to complain about headaches, back pain and chest pain in May and June 2012.

Maybe there's more out there than was presented to the court; even if there isn't, the court can speculate as to why nothing else was done by Dr. Sumnicht or anyone else in HSU at this point. But this isn't going to cut it at the Rule 56 state of a lawsuit. Given the lack of explanation about what, if any medical judgment, went into these decisions not to reconsider or change Holton's pain management regimen, a jury could reasonably infer from the facts currently in the record that Dr. Sumnicht acted with deliberate indifference to Holton's persistent complaints of unalleviated pain between June and December of 2010; between March 23 and September 26, 2011; and after February 13, 2012. As a result, this case will proceed to trial on this narrow issue.


## III.  State Negligence Claims

To prevail on a claim for negligence or medical malpractice in Wisconsin, Holton must prove that Dr. Sumnicht breached his duty of care to him and that he suffered injury as a result. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860; *see also* Wis J-I Civil 1023 (negligence is failure to use the required degree of skill exercised by an average physician). Unless the situation is one in which common knowledge affords a basis for finding negligence, medical malpractice cases require expert testimony to establish the standard of care. *Carney-Hayes v. Northwest Wisconsin Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524.

Defendants contend that a lay person would not know the appropriate standard of care to which Dr. Sumnicht was subject in this case and Holton has not named an expert to establish it. In his brief in response to defendants' motion for summary judgment, Holton responds that the state owes him a duty of care under Wis. Stat. § 302.38, which provides that "[i]f a prisoner needs medical or hospital care . . . the sheriff, superintendent or other keeper of the jail or house of correction shall provide appropriate care or treatment and may transfer the prisoner to a hospital or to an approved treatment facility." Although the statute requires the state to provide necessary medical treatment, it does not establish what treatment is appropriate, particularly in this case where Holton presented with various chronic symptoms.

I agree that the standard of care for MAC, sarcoidosis and many of Holton's other conditions and symptoms are not matters of common knowledge, which means that they would require expert testimony before a jury could conclude that Dr. Sumnicht's actions constituted negligence. Holton's complaints of pain, however, are a different matter. In *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004), the Court of Appeals for the Seventh Circuit explained the types of cases in which expert testimony is not required:

> Wisconsin allows application of *res ipsa loquitur* as a substitute for expert testimony in extreme cases where the physician's negligence is obvious such as when a surgeon leaves a sponge or other foreign object inside a patient during surgery or removes the wrong organ or body part. *Richards v. Mendivil*, 200 Wis. 2d 665, 548 N.W.2d 85, 89 (Ct. App. 1996); *Christianson v. Downs*, 90 Wis. 2d 332, 338, 270 N.W.2d 918, 921 (1979).

In *Gil*, a doctor discontinued a specific prescription issued by another doctor, with actual knowledge that the inmate was experiencing surgical complications that required antibiotics and

pain medications.  *Id.* at 653 and 662.  The court of appeals concluded that the facts were sufficient to allow a layperson to conclude that the defendants had been negligent in not responding adequately to a known risk and that the plaintiff did not need to present expert testimony.  *Id.* at 660–62.

Here, Holton alleges that Dr. Sumnicht ignored his complaints that his pain medications were not working and that he remained in severe pain.  Given the facts submitted to the court at this juncture in the lawsuit, it would seem that it is common knowledge that a failure to supply pain medication or to reassess whether current medications are effective could result in unnecessary pain and suffering.  *See Gil*, 381 F.3d at 661 (within layperson's purview to know that failure to supply or delay in supplying antibiotic can result in unnecessary pain, discomfort and spreading of diagnosed infection); *Drexler v. All American Life & Casualty Co.*, 72 Wis. 2d 420, 428, 241 N.W.2d 401, 406 (1976) (expert medical testimony not essential to support finding that pain exists).

Holton might need expert testimony — which he has not adduced — to refute Dr. Sumnicht's defense at trial.  For example, it seems likely that Holton would need an expert to opine on the efficacy, timing and appropriateness of the drugs prescribed to address Holton's various complaints of pain, given Holton's overall medical condition.  However, because it is possible that Holton may not need a medical expert to pursue his state law negligence claim on his complaints of *untreated* pain, I will not grant summary judgment to the defendants on Holton's these claims.

The defendants are entitled to summary judgment on Holton's other state law claims because Holton has failed to adduce any evidence that Dr. Sumnicht's care fell below the

standard of care exercised by the average practitioner acting in the same or similar circumstances. *Sawyer v. Midelfort,* 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999).

## IV. Plaintiff's Motions

### A. Motion to Reconsider

In a one-paragraph motion, Holton simply asks this court to reconsider its August 2, 2013 order denying his motion for preliminary injunctive relief, motion for leave to amend his complaint, motion for assistance in recruiting counsel and motion to compel defendants to provide him with copies of all DOC medical policies and procedures, as well as his medical records.

Courts may grant Rule 59(e) motions "to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996); *see also Miller v. Safeco Ins. Co. of America*, 683 F.3d 805, 813 (7th Cir. 2012). This rule "enables the court to correct its own errors and thus avoid unnecessary appellate procedures." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996). I am denying Holton's motion because he has failed to present any newly discovered evidence or point to any manifest error that the court committed.

### B. Renewed Request for Recruitment of Counsel

To the extent that Holton's motion for reconsideration can be read to include a renewed motion for recruitment of an attorney , I am denying this request. Unlike indigent *criminal*

27

defendants, *civil* litigants have no automatic right to court-appointed counsel. *Luttrell v. Nickel*, 129 F.3d 933, 936 (7th Cir. 1997). The test for determining whether to recruit counsel is two-fold: "[T]he question is whether the difficulty of the case – factually and legally – exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007). In other words, given the complexity of the case, does this plaintiff appear to be competent to try the case on his own? *See Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010) (citing *Pruitt*, 503 F.3d at 654). In this case, Holton has presented no new factual or legal arguments that persuade me that he is entitled to appointment of counsel.

The record in this case reveals that Holton has competently represented himself thus far. All of his submissions have been coherent and articulate. He did a better than average job of defending against defendants' motion for summary judgment. He prepared proposed findings of fact and supported them with his affidavit and attached exhibits. Holton was able to raise an issue of genuine material fact with respect to one claim and the case will proceed to trial.

In addition, Holton soon will be provided with this court's trial preparation order, which will provide him with the necessary instructions relating to the conduct of trial. There is no complicated legal preparation necessary in this case. The sole issue remaining for trial presents a straightforward issue that requires little more from Holton beyond his testimony to the jury narrating his version of events regarding his complaints of pain and Dr. Sumnicht's alleged responses and alleged failures to respond.

At trial, Holton is capable of telling the jury his version of what happened based on his personal knowledge. He will be able to tell the jury who he is, where he was housed, who Dr.

Sumnicht is, what Dr. Sumnicht's job is, what symptoms Holton had, what Holton told Dr. Sumnicht about his symptoms, and what Sumnicht did (and did not do) in response.  Many prisoners write down ahead of time what they wish to say, then practice saying it so that it is clearer for the jury to understand.  At trial the assistant attorney general will be allowed to ask Holton questions relevant to the remaining issue, and Holton will have to answer those questions as best he can, based on what he knows and what he remembers.  Although few witnesses enjoy being cross-examined, it is something that Holton can handle on his own without assistance from an attorney.

If Holton wants to, he can call Dr. Sumnicht as a witness and ask him questions directly.  Holton also can choose to wait because the assistant attorney general will call Dr. Sumnicht as a witness so that Dr. Sumnicht can provide the jury with his version of what happened and why.  Then Holton will have a chance to ask Dr. Sumnicht questions on cross-examination to see if Holton can make impeach his testimony.  Although defendants have not explained Dr. Sumnicht's actions with respect to this specific issue, they generally contend that all of Dr. Sumnicht's decisions were made for good reasons.  The jury will listen to the testimony and decide whom it believes.

After both sides are done presenting evidence, Holton will have a chance to argue to the jury why they should believe his version of what happened and why this is a violation of his constitutional right to be free from deliberate indifference to his pain.  Dr. Sumnicht's lawyer will make a closing argument, then Holton may, if he wishes, close out with a short rebuttal argument.  Then the court will instruct the jury on the applicable legal standards and explain the manner in which the jury is to reach its decision on the verdict.

Soon the court will send Holton a trial preparation order that explains these procedures to him in more detail.  Also, I can assure Holton that at the trial,  I will take into account the fact that he is not a lawyer and that he has never tried a case like this before.  I will explain the way things work during trial and I will answer his questions.  I can further assure Holton that the assistant attorney general will not try to take advantage of him at trial and that the court will act as a neutral referee between the parties.    I have presided over many pro se prisoner trials just like this one, so I know how to keep the parties, lawyers, witnesses and the jury on track.

### C.  Legal Loan

On October 16, 2013, well after the completion of briefing on the summary judgment motion, Holton moved for an extension of a legal loan to copy (and presumably file) a motion for leave to amend his complaint and related documents.  Holton previously moved for leave to amend his complaint "to conform the evidence regarding David Burnett's personal involvement in plaintiffs claims," dkt. 37, but I denied that motion on August 2, 2013 because he had not filed a new complaint, dkt. 64 at 11.  Although Holton could have filed a proposed amended complaint soon thereafter, he did not do so, choosing to wait until after the summary judgment motion had been filed and fully briefed.

At this late stage in the lawsuit, Holton may amend his complaint only with defendants' consent or permission from the court.  Fed. R. Civ. P. 15(a)(2).  Although Rule 15(a)(2) states that a court should freely grant a party leave to amend its pleadings "when justice so requires," a request to amend maybe denied on several grounds, including undue delay, undue prejudice to the party opposing the motion or futility of the amendment.  *Sound of Music v. Minnesota*

30

*Mining and Manufacturing Co.*, 477 F.3d 910, 922-23 (7th Cir. 2007).  I am denying Holton's motion because adding new allegations against another defendant at this point would unduly delay the progress of this case and be unduly prejudicial to defendants.  *See Cleveland v. Porca Co.*, 38 F.3d 289, 297 (7th Cir. 1994) (finding no abuse of discretion in denying motion to amend complaint where motion was filed after discovery was completed, motions for summary judgment were fully briefed and witness and exhibit lists were already submitted); *Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 625 (7th Cir. 1987) (finding no abuse of discretion in denying motion to amend complaint when motion was filed after discovery was completed and after defendant had moved for summary judgment, without adequate explanation for the delay); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982) (finding no abuse of discretion in denying motion to amend complaint where motion was filed after discovery was completed and sought to inject a new theory of recovery into the litigation).

ORDER

IT IS ORDERED that:

(1)     The motion for summary judgment filed by defendants Dr. Paul Sumnicht, Gary Hamblin and David Burnett, dkt. 54, is DENIED with respect to plaintiff's federal and state claims that Dr. Sumnicht failed to address plaintiff's reports of pain between June and December of 2010; between March 23 and September 26, 2011; and after February 13, 2012;

(2)     Defendants' motion for summary judgment is  GRANTED in all other respects;

(3)     Plaintiff's renewed motion for assistance in recruiting counsel and motion for reconsideration of the court's August 2, 2013 order, dkt. 73, is DENIED.

(4)     Plaintiff's motion for the extension of a legal loan, dkt. 81, is DENIED.


Entered this 2nd day of December, 2013.

                            BY THE COURT:

                            /s/

                            STEPHEN L. CROCKER
                            Magistrate Judge